UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Wells Fargo Bank, N.A.,          :
                    Plaintiff,   :
                                 :
          v.                     :     File No. 1:07-CV-169
                                 :
Howard M. Sinnott, II,           :
Janet M. Sinnott, United         :
States Department of             :
Justice, and Occupants           :
residing at 20 Monument          :
Ave., Bennington, Vermont,       :
                    Defendants.  :


MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Documents 71 and 75)

     Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo" or "the

bank") initiated this action for foreclosure in state court.

(Doc. 4-2.)  The United States Department of Justice, a

lienholder on the property in question, removed the case to

this Court.  The mortgagors, Howard and Janet Sinnott

("Sinnotts"), have filed an answer and counterclaims.  (Doc.

10.)  The Sinnotts do not dispute that they failed to pay

real estate taxes in 2005 and 2006, and have failed to make

mortgage payments since April of 2007, contrary to their

mortgage covenants.  However, the Sinnotts assert that the

bank violated both its duty of good faith and fair dealing,

1

as well as loan servicing rules, when it increased the Sinnotts mortgage payment in order to (1) recoup the real estate taxes that had been paid to the Town of Bennington and (2) fund an escrow account for future property taxes. In addition, the Sinnotts assert that Well Fargo's reliance on language contained in the Mortgage to justify the increased mortgage payment was wrong as the original lender waived the requirement that an escrow account be established and maintained.

The Sinnotts have moved for summary judgment seeking both dismissal of the Complaint of Foreclosure, and judgment on their counterclaims, and they seek a trial to determine damages. (Doc. 71.) Wells Fargo has filed a cross-motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the foreclosure claim, asserting that the Sinnotts are in default on their mortgage and have failed to cure their default. (Doc. 75.)

For the reasons set forth below, I recommend that the Wells Fargo's motion for summary judgment on its claim of foreclosure be GRANTED, and the Sinnotts' motion be DENIED.

## I.   Factual Background

The following facts are undisputed unless otherwise indicated.

### A.   The Mortgage

1.   In 1986, defendants Howard and Janet Sinnott purchased a home located at 20 Monument Avenue in Bennington, Vermont.

2.   In 1993 the Sinnotts sought to refinance their home.  In the course of that process they received a loan commitment letter dated July 2, 1993 from the Kittredge Mortgage Company ("Kittredge") in which Kittredge expressed its commitment to extend a $100,000 mortgage loan to the Sinnotts at an interest rate to be determined.  (Doc. 85-4.) That commitment was accepted by the Sinnotts.  The Sinnotts received a follow up commitment letter dated July 8, 1993 (the day of the loan closing), advising them of the specific loan interest rate.  (Doc. 85-3.)  In each commitment letter, a representative of Kittredge noted that although Kittredge required that an escrow account for real estate taxes and fire/hazard insurance be established, the Sinnotts had "chosen to waive this requirement."  For this waiver,

according to Kittredge, the Sinnotts' mortgage loan rate was increased .125%.[1]  (Doc. 85-3, 85-4.)

3.  The July 2 commitment letter also stated that the Sinnotts "agreed to join with the lender whether at or after the closing in the execution of any documents the lender might require to protect or preserve its collateral interest."   The Sinnotts accepted the terms of the two commitment letters by signing each letter.

4.  On July 8, 1993, the Sinnotts closed on the refinancing loan and executed a 30-year promissory note in the amount of $100,000 in favor of Kittredge Mortgage Corporation, secured by a 30-year mortgage deed for the Bennington house.  (Doc. 71-2, 71-12.)  The note required a monthly payment of $716.42 at an annual interest rate of 7.75%.  All of the relevant loan closing documents were signed by Howard Sinnott personally and on behalf of his spouse as attorney in fact.

5.  Section 1 of the Mortgage requires the Sinnotts to pay principal and interest when due.  Section 2 of the

---

[1]  Wells Fargo produced these Kittredge Mortgage Company letters in discovery.  Their significance was apparently overlooked as no specific reference was made to the letters in the summary judgment motions. Consequently, Wells Fargo initially argued that the defendants failed to establish the existence of any written waiver of the mortgage escrow requirement.  (Doc. 76.)  Both sides have since revised and refined their arguments.

Mortgage allows a Lender to collect funds from the Borrower for "Escrow Items," including property taxes and insurance premiums, unless such rights are waived in writing by the Lender.  Section 2 states that "Lender may, at any time, collect and hold [such] Funds in an account."  Section 2 further provides "[i]f the amount of Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency.  Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion."  (Doc. 71-12.)

6.   In Section 4 of the Mortgage the Sinnotts agreed, inter alia, to pay all taxes on the property and, in the event an escrow account was not established as contemplated in Section 2, the Sinnotts agreed to pay these obligations "on time to the person owed the payment."  (Doc. 71-12, p.5.)  In Section 6 of the mortgage, the borrowers agreed not to "commit waste on the property."  (Doc. 71-12.)

7.   Section 7 of the Mortgage provides that "If Borrower fails to perform the covenants and agreements contained in this Security Instrument,  . . .  the Lender

may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property." It also provides that "[a]ny amounts disbursed by Lender under this paragraph shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts ... shall be payable, with interest, upon notice from Lender to Borrower requesting payment." (Doc. 71-12, p.6.)

8. The Note and the Mortgage deed were immediately assigned by Kittredge on July 8, 1993 to Centerbank Mortgage Company. (Docs. 71-12, 4-2, ¶ 7, 76, ¶ 10, 81-4, p.10 and 87-4.) Howard Sinnott, acting for himself, and on behalf of his spouse as attorney in fact, signed a Centerbank document styled as an "Escrow Waiver Request" dated July 8, 1993 in which the Sinnotts again requested a waiver of both the real estate tax and the hazard insurance escrow requirement. (Doc. 83-3.)

9. In the Centerbank Escrow Waiver Request, the Sinnotts confirmed that the escrow waiver could be rescinded if the Sinnotts failed to pay their property taxes. The document states:

"I understand that Centerbank Mortgage Company, or any
lender/service to whom Centerbank Mortgage Company may sell
my loan will have the right, at any time during my loan
term, to require me to make monthly payments for taxes,
hazard insurance and any other items allowed by the mortgage
deed.... The circumstances under which I may be required to
pay monthly escrow payments include, but are not limited to
the following: delinquency of any of my monthly mortgage
payments; delinquency in any payment of real estate taxes or
hazard insurance premiums; ... [and] any other default as
described by my mortgage documents." (Doc. 83-3.)

Centerbank agreed in the document that it would not

"unreasonably request reinstatement of monthly escrow

payment requirement." (Doc. 83-3.) No escrow account was

established at the 1993 loan closing. The Sinnotts made

regular monthly payments and abided by the mortgage

covenenants until 2005.

10. The Note and Mortgage were transferred multiple

times over the next several years. From at least the

beginning of 2006 until February 15, 2007, Washington Mutual

Bank ("WaMu") serviced the Sinnotts' mortgage loan for its

investor, the Federal Home Mortgage Loan Corporation

("Freddie Mac" or "FHMLC"). Wells Fargo acquired the

servicing rights for the Sinnotts' loan, as well as others,

from WaMu by a Purchase and Sale Agreement dated July 17,

2006. The effective date of the transfer was February 16,

2007. (Doc. 76-6, ¶ 12.) By letter dated February 1, 2007,

WaMu notified the Sinnotts that, effective February 16, 2007, the servicing of their mortgage loan would be transferred to Wells Fargo. (Doc. 76-9.) WaMu advised the Sinnotts that the assignment, sale or transfer of the servicing of the mortgage loan "does not affect any term and condition of the mortgage documents." (Doc. 76-9.) On February 2, 2007, Wells Fargo also sent a letter to the Sinnotts to welcome them as customers of Wells Fargo Home Mortgage. Wells Fargo similarly advised the Sinnotts that there would be no change in the terms or conditions of the mortgage and loan. (Doc. 71-34.)

**B. Events Leading to the Claimed Default**

11. In 2002, Mr. Sinnott came under federal criminal investigation, and was indicted by a federal grand jury and charged with fraud offenses in 2003. In February 2005, Mr. Sinnott pled guilty in the United States District Court for the District of Vermont to two felony counts of interstate transportation of stolen property, and was later sentenced o three months imprisonment, as well as three years of supervised release, and he was required to pay restitution to the United States in the amount of $500,000. The United States recorded the restitution order as a lien on Mr.

Sinnott's interest in two parcels of property owned by the Sinnotts, their Bennington home and an undeveloped parcel in Wilmington, Vermont. Mr. Sinnott was required by the Court to pay 10% of his monthly income toward his restitution obligation.

12. In 2005, Defendants failed to pay property taxes due on November 10th on the Monument Avenue home. According to the Sinnotts, they used the money they had set aside for Bennington property taxes that year to build a driveway on their Wilmington property in order to sell the Wilmington property. (Doc 76-4, p.6.) The sale of the Wilmington property did not occur. (Doc. 76-4.) The Sinnotts also failed to pay their property taxes in 2006. (Doc. 76-4.)

13. On July 2006, WaMu contacted the Sinnotts by telephone and inquired about the delinquent property taxes and requested proof of their payment. Mr. Sinnott responded that he did not have sufficient funds to pay the taxes. (Doc. 76-16.) WaMu informed Mr. Sinnott that it would pay to the Town the outstanding real estate taxes and would seek reimbursement from by the Sinnotts. (Doc. 76-16.) WaMu then paid the Sinnotts' delinquent property taxes for 2005 and 2006.

14. As noted above, Wells Fargo agreed to assume responsibility for servicing the Sinnott's mortgage in July of 2006. The effective date of the transfer was February 16, 2007.

15. Upon assuming responsibility for the servicing of the Sinnotts' loan, Wells Fargo performed what Wells Fargo described as an "escrow review and reconciliation" under the apparent belief that the Sinnotts had a responsibility under the terms of the mortgage to fund an escrow account. On February 23, 2007 Wells Fargo issued an "Escrow Disclosure Statement and Notice of New Mortgage Payment" (Doc. 76-17) in which Wells Fargo gave notice of an increase to the Sinnotts' monthly mortgage payment in order to satisfy the amount owed for the prior payment of the 2005-2006 real estate taxes, recouping that debt over a period of 12 months. The Notice also stated that the Sinnotts monthly escrow for their future property tax liability would be increased from $0.00 to $475.30 per month. The Sinnott's mortgage payment therefore rose for that one year period from $716.42 per month to $2537.77 per month. The increase is attributable to (1) the additional monthly sum of $1345.96 to recoup the previously paid two years worth of

real estate taxes, and (2) an additional $475.39 to fund an escrow for the Sinnotts' future annual property tax and insurance obligations. (Doc. 76-6, 76-17.) The new payment was scheduled to commence April 1, 2007.

16. On April 10, 2007 Mr. Sinnott wrote to Wells Fargo acknowledging the proposed increase by stating that "I am mindful that you are billing us to cover an escrow amount due." Mr. Sinnott proposed that the "shortfall of escrow" be spread out over the remaining life of the loan. Mr. Sinnott did not delineate between past sums owed for real estate taxes and future tax obligations. The Sinnotts made an April payment in the original amount of $716.42, which was applied to their escrow balance. (Docs. 76-6 and 76-22.)

17. The April 10, 2007 letter was addressed to Wells Fargo's payment processing center, which is not equipped with staff to respond to customer inquiries.

18. On April 24, 2007, Mr. Sinnott sent his April 10 letter to Wells Fargo Loan Servicing, accompanied by a cover letter questioning why the April payment was applied to escrow rather than principal and interest. (Doc. 76-19.)

19. By letter dated May 21, 2007, Wells Fargo notified the Sinnotts that their mortgage loan was in default for

failure to pay the sum of $5,278.58 due as of that date. (Doc. 76-20.)  A total of $7,756.68 was needed to bring the account current by June 20th.  The notice gave the Sinnotts 30 days to cure the default by bringing their account current.  The notice also stated that failure to pay the delinquency "will result in acceleration" of the Mortgage and Note.

20. In separate correspondence, known as a "Borrower Counseling Information Packet," also dated May 21, 2007, Wells Fargo informed the Sinnotts that they might qualify for a loan workout program, and provided forms and a Wells Fargo contact number.  (Doc. 76-21.)  That correspondence advised the Sinnotts that: "It is important to note, however, that we will not delay foreclosure action on your home, so we urge you to respond immediately."  On June 7, 2007, Wells Fargo responded to the Sinnotts' inquiry regarding the application of their recent payment to the escrow balance and again provided a contact number to discuss potential payment options.  (Doc. 76-22.)

21. The Sinnotts have made no further monthly payments on their mortgage loan.  (Doc. 76-6, ¶ 32.)

22. On June 7, 2007 Wells Fargo wrote to the Sinnotts, and the bank acknowledged that the Sinnotts had requested "a modification and extension agreement for the shortfall on the escrow account." The letter detailed the recent account history and the manner in which the April payment was accounted for given the Sinnotts' obligation to repay the real estate taxes advanced on their behalf. (Doc. 76-22.) The letter invited the Sinnotts to contact the bank's collection department if the increase was a hardship. (Doc. 76-22.)

23. On June 9, 2007 Mr. Sinnott wrote to Wells Fargo and requested "a modification and extension agreement to make the payments affordable." (Doc. 71-27.) The Sinnotts contend that, during a telephone conversation with Wells Fargo's Loss Mitigation Department on July 18, 2007, a representative told Mr. Sinnott that Wells Fargo "should have a workout plan to you within 30-45 days," and that Wells Fargo did not want to foreclose on the property. (Doc. 76-2 at 5.) Mr. Sinnott testified in his deposition that Wells Fargo made no promise to refrain from commencing a foreclosure action. (Doc. 76-2 at 7.) The Sinnotts contend that, in reliance on Wells Fargo's statements, Mr.

Sinnott "adjourned another matter pending in this Court to obtain permission to refinance the[ir] property." (Doc. 8, ¶29.) That other matter was a hearing before Judge Murtha in the federal criminal case on Mr. Sinnott's motion to release or subordinate the government's restitution lien as part of an effort to sell or refinance the property. The United States actively opposed the refinancing terms that the Sinnotts had proposed to the Court in the criminal case. (Doc. 76-2, pp. 8-12.) Mr. Sinnott was unsuccessful in securing refinancing for the Bennington property. (Doc. 76-2, p. 13.)

24. On July 5, 2007, Wells Fargo sent a Notice of Default to the Sinnotts and demanded payment. The notice also suggested that the Sinnotts call Wells Fargo to establish a payment arrangement. (Doc. 71-28.) The Sinnotts maintain that, in the July 18, 2007 telephone conversation, Wells Fargo indicated "an amenability" to make an arrangement for payment of the delinquency. Mr. Sinnott testified in his deposition that he was not looking for a guarantee of withholding of the filing of a foreclosure action but a "good faith to negotiate a workout." (Doc. 76-2, pp. 6-7; Doc. 76-4, p.7.)

25. On July 26, 2007 ownership of the mortgage and note were assigned to Wells Fargo from PNC Corporation.  (Doc. 76-23).

26. This foreclosure action was commenced in state court on August 1, 2007 and subsequently removed to this Court. (Doc. 7.)  The complaint alleges that the Sinnotts have failed to make payments called for under the Note and Mortgage.  (Doc. 4-2.)

27. Even after the foreclosure action was filed in court the Sinnotts sought to negotiate a modification of their new mortgage payment with Wells Fargo.  On November 7, 2007 the Sinnotts paid Wells Fargo $451.36 to reimburse Wells Fargo for a 2007 tax payment.  (Docs. 71-29 and 71-31.)

28. On January 14, 2008, the bank wrote to the Sinnotts and denied their request for a loan modification because "secondary lien holder(s) cannot reach a mutual agreement with the terms of our approval." (Doc. 71-33.)  The federal criminal restitution order is a secondary lien.

**C.  Freddie Mac Loan Servicing Rules**

29.  The Federal Home Mortgage Loan Corporation ("Freddie Mac"), a federally sponsored enterprise which buys

mortgages on the secondary market in order to increase liquidity and mortgage lending, has promulgated a set of guidelines which govern the servicing of their loans by entities such as Wells Fargo Home Mortgage. These guidelines are called the Freddie Mac Single-Family Seller/Servicer Guide (the "Servicer Guide") and are available on the internet at *www.freddiemac.com/sell/guide*. (Doc. 76-6, ¶ 15.)

30. The Servicer Guide protects Freddie Mac's interests in its loans which are serviced by other financial institutions. (Doc. 76-12.) Section 2.1 of the Guide sets forth the objectives of the Freddie Mac programs, which include the establishment and enhancement of markets for residential mortgages and achieving national goals of a decent home and suitable living environment for every American family. Freddie Mac discourages practices "that may contribute to displacement of neighborhood residents." (Doc. 71-17). The Guide is a contract between the lender or loan servicer and Freddie Mac. (Doc. 71-17, p.2).

31. Section 51.1 of the Servicer Guide requires loan servicers to comply with the Guide. It also states: "The Servicer is responsible for acting in the most timely,

efficient and responsible manner to protect Freddie Mac's interests." (Doc. 76-11.)  Section 59.1 provides that even if an escrow account has been previously waived a loan servicer may begin collecting Escrow upon notice to the borrower.  (Doc. 76-13).  Section 59.1 also provides that a loan servicer may schedule repayment of sums advanced to pay charges by increasing monthly payments "over the next several months."  (Doc. 76-13.)  If an escrow is not collected and the loan servicer discovers that the borrower has not paid a charge otherwise due from an escrow the loan servicer "must attempt to work out an arrangement with the borrower."  The loan servicer must also immediately recommend foreclosure if a "mutually satisfactory arrangement" cannot be made for the borrower repayment of Escrow advances.  (Doc. 76-13.)

32. Under Sections 66.9 and 66.11 of the Servicer Guide, Wells Fargo is required by Freddie Mac to commence a foreclosure action no later than the 120th day of the delinquency, even if workout negotiations remain ongoing at such time, unless Freddie Mac has approved a postponement in writing. (Doc. 76-14.)

**II.  Summary Judgment Standard**

17

Summary judgment should be granted only when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. *See Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986). The moving party has the initial burden of demonstrating that there is no genuine issue of material fact. *See Marvel Characters, Inc.*

*v._Simon*, 310 F.3d 280, 286 (2d Cir. 2002); *Goenaga v. March of_Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)(stating that movant may meet burden by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim.").

Once the movant satisfies this burden, the non-moving party must respond by setting forth "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. In determining whether summary judgment is appropriate, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

The same standard for summary judgment applies where, as here, the parties filed cross-motions for summary judgment. "[W]hen both parties move for summary judgment,

asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

**III. Analysis**

**A.  Claim of Wells Fargo**

Wells Fargo's claim is straightforward.  The Sinnotts' failure to pay their property taxes in 2005-06, and their failure to make mortgage payments constitutes a breach of their mortgage covenants and the Sinnotts are now in default of the mortgage.  Specifically, Section 4 of the Mortgage required the Sinnotts to pay their real estate taxes and they made a conscious decision to not pay those taxes.  The Sinnotts also have failed to make any mortgage payments since the April 2007 payment (except a small payment to Wells Fargo for a 2007 tax advance paid by Wells Fargo), including any monthly payment due prior to the filing of the foreclosure action.  This failure is in contravention of Section 1 of the mortgage agreement.  When asked at oral

argument whether any mortgage payments after April 2007 had been made, Mr. Sinnott stated that they have made none, suggesting that to do so would have been futile because they "are in foreclosure."  Whatever the legal relevance of such phrase may be, the defendants stopped making any mortgage payment three months before the initiation of this action.

There is no claim that the delinquency is inaccurate, or that payments have been misapplied.  A proper demand was made and the Sinnotts did not pay as they had covenanted, giving rise to the default.  The Sinnotts have not cured that default, the note has been accelerated and therefore foreclosure is warranted.

The Sinnotts assert counterclaims that are equitable in nature in their effort to defeat Wells Fargo's claim for foreclosure and the Sinnotts seek an award of unspecified damages for purportedly harming the Sinnotts chances of gaining alternative financing.

"[F]oreclosure actions are equitable in nature and therefore it is proper for the court to weigh the equities of the situation." *Merchants Bank v. Lambert,* 559 A.2d 665, 666 (Vt. 1989).  "Where [a] mortgagor establishes damages arising from [a] mortgagee's breach of contract exceeding

the amount due on the note, the mortgagor cannot be held in default on the note." *Retrovest Assocs., Inc. v. Bryant,* 573 A.2d 281, 285 (Vt. 1990).  The Vermont Supreme Court has endorsed consolidation of a foreclosure judgment with all claims for damages against the Mortgagee. *Id.* "A weighing of the equities necessarily involves judicial discretion in evaluating a broad range of relevant considerations." *New England Educ. Training Serv., Inc. v. Silver St. P'ship*, 595 A.2d 1341, 1345 (Vt. 1991).  The Vermont Supreme Court has observed that relevant considerations may include: "[t]he sufficiency of the consideration, the mutuality, certainty, and clarity, completeness, and fairness of the contract, its capability of proper enforcement by decree, and the presence or absence of any showing that it is tainted or impeachable, or that its enforcement would be unconscionable are elements relevant to the exercise of that discretion."   *Id.* (quoting *Johnson v. Johnson,* 125 Vt. 470, 218 A.2d 43 (1966)).

The Sinnotts argue in essence that (1) Wells Fargo's reliance on the language of Sections 2 and 7 of the Mortgage instrument to establish an escrow account for future property tax obligations in 2007 and to attempt to collect the sums paid by the bank to the town was misplaced, (2)

that Wells Fargo purportedly ignored and violated the mortgage loan servicing rules by not negotiating further with the Sinnotts; and (3) that enforcement of the Mortgage provisions and the resulting foreclosure would be "unconscionable" because Wells Fargo acted in "bad faith" and in a "fraudulent" manner. (Doc. 71, 4-6.) Wells Fargo denies each assertion.

**B.   The Establishment of An Escrow Account in 2007 was Proper Given the Failure to Pay Property Taxes.**

The Sinnotts argue that the establishment of the escrow account to collect future property taxes in 2007 by Wells Fargo was improper because Kittredge Mortgage Company (Wells Fargo's predecessor in interest) had waived that escrow requirement in 1993. The Sinnotts are correct that Kittredge Mortgage Company agreed to waive the escrow requirement in its commitment letters to the Sinnotts in 1993. (Docs. 85-3, 85-4.) The evidence shows that the 1993 loan closing went forward and that the mortgage was immediately assigned to an entity known as Centerbank. On the day of the closing the Sinnotts executed an Escrow Waiver Request form and agreed with Centerbank (and its successors) that the escrow requirement could be reinstated

*if* the Sinnotts failed to pay their property taxes. (Doc. 83-3.) When the Sinnotts failed to pay their property taxes in 2005 and 2006, Wells Fargo acted in accordance with that agreement by giving notice of a rescission of the escrow waiver in the form of the "Notice of New Mortgage Payment." (Doc. 76-17). That recision thereupon gave rise to the obligations and remedies of Section 2 of the Mortgage permitting Wells Fargo to require the establishment and funding of a property tax escrow account. *North American Security Life Ins. Co. v. Harris Trust and Savings Bank*, 859 F. Supp. 1163 (N.D. Ill. 1994)(upholding the reinstatement of a waived escrow upon borrower's failure to pay real estate taxes). There is nothing in the record to show that the establishment of the escrow account to collect future taxes was inequitable or unreasonable.

The Sinnotts also suggest that Wells Fargo had no right to take such action in 2007 as Wells Fargo was only the loan servicer at the time of such action and not the actual owner of the note or holder of the mortgagee. However Wells Fargo, as the agent for the mortgagor, was acting on behalf of the owner of the note and holder of the mortgage under

traditional concepts of agency.  *See, Restatement (Third) of Property (Mortgages)* §§ 5.4, 5.5 (1997).

The Sinnotts also assert that the 1993 Kittredge loan commitment letter stating that the Sinnotts had "chosen to waive" the escrow requirement waiver predates the Centerbank agreement.  Therefore, argue the Sinnotts, the Kittredge letters nullify the agreement the Sinnotts entered into with Centerbank.  This concept of nullification is not supported by any citation to law nor the evidence.

### C.   The Effort to Collect the Previously Paid Taxes Was Consistent with Section 7 of the Mortgage

As discussed below, the Sinnotts argue that Wells Fargo violated loan servicing rules when they sought to recover the 2005-2006 property taxes from the Sinnotts over a 12 month period.  As a parallel to this argument, the Sinnotts contend that Wells Fargo's reliance on Section 7 of the Mortgage to collect this past due amount was misplaced.  The Court disagrees.

Section 7 of the Mortgage provides that Wells Fargo shall be entitled to make payments to protect the property, including payment for delinquent taxes and insurance premiums, and may recover the same from the Sinnotts.

Section 7 further provides that: "[i]f Borrower fails to perform the covenants and agreements contained in this Security Instrument, . . . the Lender may do and pay for whatever is necessary to protect the value of the property and Lender's rights in the Property." (Doc. 76-8, p.5.) Section 7 of the Mortgage also authorizes Wells Fargo to increase the monthly payment due in order to recoup additional funds expended by the lender: "[a]ny amounts disbursed by Lender under [Section 7] shall become additional debt the Borrower secured by the [Mortgage]." *Id.* The Note calls for the Sinnotts to make monthly payments on the principal and interest of loan; failure to make monthly payments means the Sinnotts are in default on the Note and Mortgage. (Doc. 71-12, p.1.) The Sinnotts have made no payments on the note in over two years. The increased monthly payment is consistent with the lender's remedies set forth in Section 7. Wells Fargo never waived its remedy of collection of that delinquent debt. *Scott v. Fairbanks Capital Corp.*, 284 F. Supp. 2d 880, 891 (S.D. Ohio 2003).

> **D.** **The Sinnotts Are Not Third Party Beneficiaries to the Freddie Mac Loan Servicer Guide.**

The Sinnotts assert a legal claim that Wells Fargo breached the Freddie Mac Single-Family Seller/Servicer Guide ("Servicer Guide"). The Servicer Guide is a standard contract between Freddie Mac, the U.S. corporate instrumentality that purchased Defendants' Mortgage, and Wells Fargo. (Doc. 71-17, §§ 1.2 and 50.2.) The Servicer Guide requires Wells Fargo to service Freddie Mac's mortgage loans in accordance with the terms set forth in the Guide. The Sinnotts contend that "Wells Fargo, as the servicer for Freddie Mac, totally ignored and violated the terms of its contract [Servicer Guide]." (Doc. 71, p.5.) While the Servicer Guide is a contract to which Freddie Mac and Wells Fargo are in privity, the Sinnotts allege that they are nonetheless "a third party beneficiary," entitled to certain enforceable rights under that contract. (Doc. 71, p.8.) The Sinnotts' argument fails for three reasons. First, under Vermont law, the contracting parties must intend to grant third party beneficiary status and there is no evidence of that intent. Second, the federal courts that have considered the issue have held that borrowers such as the Sinnotts are not third-party beneficiaries to the Servicer Guide between Freddie Mac and lenders. Thirdly,

assuming arguendo, that the Sinnotts are indeed third party beneficiaries to the contract, Wells Fargo's actions were consistent with the Servicer Guide.

A person who is not a party to a contract has no rights under the contract, with the possible exception of third-party beneficiaries. *See* 17A Am. Jur. 2d *Contracts* § 425, at 409 (2004) (the third-party beneficiary rule "applies in determining who may enforce the terms of a contract"). "The determination of whether a party may be classified as third-party beneficiary, as opposed to an incidental beneficiary, is based on the original contracting parties' intention." *McMurphy v. State,* 171 Vt. 9, 16, 757 A.2d 1043, 1049 (2000). In order to establish third-party beneficiary status, "plaintiff must prove that the primary purpose and intent of the [contractual] relationship was to benefit or influence the third party." *Hedges v. Durrance,* 175 Vt. 588, 590, 834 A.2d 1, 4 (2003); *see Morrisville Lumber Co. v. Okcuoglu,* 148 Vt. 180, 184, 531 A.2d 887, 890 (1987) (to prevail as a third-party beneficiary, plaintiff must present evidence that parties "entered into their agreement in contemplation of conferring a benefit on the plaintiff"). "Because third-party beneficiary status constitutes an

exception to the general rule that a contract does not grant enforceable rights to nonsignatories, a person aspiring to such status must show with special clarity that the contracting parties intended to confer a benefit on him." *McCarthy v. Azure,* 22 F.3d 351, 362 (1st Cir. 1994) (citation omitted). "These requirements are not satisfied merely because a third party will benefit from performance of the contract." *Id.* at 362, n.16.

The Sinnotts cannot establish that a primary purpose and intent of the Guide are to confer a benefit upon them. The terms of the Servicer Guide make clear that it exists not for the benefit of defaulting borrowers but rather to protect Freddie Mac's interests in its loans which are serviced by other financial institutions. (Docs. 76-11, 76-12.) Section 51.1 of the Guide states that "[t]he Servicer is responsible to act in the most timely, efficient and responsible manner to protect Freddie Mac's interests." Further, Section 59.1 was written to ensure payment of Escrow items, the non-payment of which could result in first liens with priority over Freddie Mac's, and to require that such payments are recovered from borrowers. There is simply no direct language in the Guide to support the Sinnotts'

contention that borrowers are intended third-party beneficiaries to the Guide.

The argument that a mortgagor has third-party beneficiary status under the Servicer Guide has been uniformly rejected by the federal courts. For example, in *Deerman v. Fed. Home Loan Mortgage Corp.,* 955 F. Supp. 1393 (N.D. Ala. 1997), *aff'd,* 140 F.3d 1043 (11th Cir. 1998), plaintiffs sued Freddie Mac seeking cancellation of the obligation in their mortgage contracts to pay for private mortgage insurance ("PMI"). Because these contracts required that such insurance be maintained for the life of the loan and did "not provide a specific right of cancellation to the borrower," plaintiffs argued, as do the Sinnotts, that they were third-party beneficiaries of the Servicer Guide. *Id.* at 1397, 1404. The *Deerman* court held that plaintiffs' "assertion is incorrect as a matter of law" and dismissed the claim. *Id.* at 1404. As the court noted, "no provision in the Guide indicates any intent on the part of the FHLMC that third parties have a right to enforce it." *Id.* Further, the court found that "the provisions in question were written primarily to ensure that the FHLMC was protected by mortgage insurance, and any benefit claimed by

the plaintiffs is incidental." *Id.* Thus, Freddie Mac "did not intend to and has not created an enforceable right to cancel PMI," and borrowers were "not intended third-party beneficiaries of the mortgage servicing guidelines set forth in the Guide." *Id.* at 1405.

The *Deerman* court relied on an earlier decision of the Fifth Circuit in *Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 362 (5th Cir. 1977). In that HUD foreclosure action, the Fifth Circuit held that a borrower was not a "third party beneficiary" of a service contract between HUD and HUD's servicer because "a beneficiary is 'intended,' and not merely 'incidental,' only if the performance of the promise satisfies an obligation of the promisee to pay money to the beneficiary, or if the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. In other words, [one of the contracting parties] would have to intend that the mortgagor have an enforceable right." *see also Thorien v. BARD Entrers., LLC (In re Thorien),* 2008 WL 5683488, at *8 (Bankr. D. Idaho Nov. 6, 2008) (dismissing claim and holding that borrowers were not third-party beneficiaries of Servicer Guide, although they may "have incidentally

benefitted from the Guide's loss mitigation provisions");
*Blair v. Source One Mortgage Servs. Corp.,* No. CIV.A. 96-
2497, 1997 WL 732407, at *2 (E.D. La. Nov. 20, 1997)
(finding that borrower's "potential benefit" from the
Servicer Guide "is incidental to [its] primary purpose" and
granting summary judgment in favor of mortgage lender on
third-party beneficiary claim).

The Sinnotts attempt to distinguish the *Deerman*
decision and the other cases by asserting that these cases
arose in other jurisdictions.  This argument is misplaced.
Decisions from other federal district courts are not
binding, but are significantly persuasive.  More
importantly, these decisions are consistent with Vermont law
on third party beneficiary status.  Each of these decisions
is founded on the universal concept that third party
beneficiary status must be intended by the contracting
parties.  *See, Hedges,* 175 Vt. at 590; *Morrisville Lumber,*
148 Vt. at 184; *Restatement (Second) of Contracts* § 315
(1981) ("An incidental beneficiary acquires by virtue of the
promise no right against the promisor or the promisee.");
*Bischoff v. Bletz*, 949 A.2d 420, 425-26 (Vt. 2008)
("Generally, unless he is an intended third-party

beneficiary of the contract, a stranger to a contract lacks standing to bring an action for breach of that contract.") (citing 13 S. Williston & R. Lord, *A Treatise on the Law of Contracts* § 37:1, at 5 (4th ed. 2000) (with the exception of third-party beneficiaries, "courts recite talismanically . . . that 'strangers to a contract' have no rights under the contract."))).

As the Sinnotts cannot show that they were an intended beneficiary of the Servicer Guide, they are not third-party beneficiaries  to that contract.

### E. Wells Fargo Did Not Violate the Loan Servicing Guidelines

Finally, even assuming *arguendo* that the Sinnotts are third-party beneficiaries of the Servicer Guide, they have failed to show any material breach of that Guide by Wells Fargo.

Section 59.1 requires loan servicers to "attempt to work out an arrangement" with the borrower when the servicer advances sums on behalf of a borrower for such items as property tax payments.  Wells Fargo proposed that the debt be paid immediately or, alternatively, that it be repaid over a 12 month period as called for in Section 2 of the

Mortgage.  The Sinnotts countered, proposing that the taxes be repaid over the remaining life of the loan.  This proposal was rejected.

The bank is correct that Section 59.1 does not require acquiescence to a borrower's proposal regarding repayment of an escrow advance, such as proposed here, by spreading the deficiency out over the 16 years remaining in the life of the loan.  This is especially true where the property is also subject to an enormous criminal restitution lien. Section 59.1 requires the servicer to pay any escrow items that are unpaid, in order to prevent liens from obtaining priority over the mortgage lien, and to secure repayment by the borrower of such amounts.  Under Section 59.1, even if previously waived, a servicer may begin collecting an escrow upon notice to the borrower, and must also immediately recommend foreclosure if a mutually satisfactory arrangement cannot be made for the borrower's repayment of escrow advances.  Further, Wells Fargo is *required* by Freddie Mac to commence a foreclosure action no later than the 120th day of delinquency, even if workout negotiations remain ongoing at such time.  Guide section 66.9, 66.11.  Wells Fargo did just that when it commenced foreclosure proceedings in this

matter on August 1, 2007.

There is no doubt that Mr. Sinnott wanted continued negotiations with the bank. But Wells Fargo did not fail to attempt to work out an arrangement with the Sinnotts. The Sinnotts declined the repayment arrangement, apparently because they simply could not afford the new payment because of the unfortunate collateral consequences arising from his conviction, being the missed tax payments, the loss of income and the restitution owed to the victims of the fraud. In fact, it appears from the Sinnotts' own evidence that Wells Fargo rejected his proposals because "secondary lienholder(s)" would not agree to the proposal. (Doc. 71-33.) Nevertheless the fact that a mutually agreeable resolution was not arrived at does not mean Wells Fargo "totally ignored" the Guide's requirements as claimed by the Sinnotts.

## F.    The Claim that Wells Fargo Acted Fraudulently and in "Bad Faith"

The Sinnotts argue that enforcement of the terms of the Mortgage Deed would be "unconscionable," because Wells Fargo's actions were "fraudulent" and performed in bad

faith.  Contrary to the Sinnotts' claim, there is no evidence in the record to support this assertion.

An implied covenant of good faith and fair dealing prevails in every contract in order to prevent the parties to the contract from injuring or destroying the rights of the other party.  *Shaw v. E.I. DuPont de Nemours & Co.*, 126 Vt. 206, 209 (1966).

"The covenant of good faith and fair dealing is implied in every contract; its boundaries, however, are contextual and fact-specific."  *R&G Props., Inc. v. Column Fin., Inc.,* 2008 VT 113, 2008 WL 3877126, at *12 (Aug. 22, 2008).  It embodies the principle "that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement."  *Carmichael v. Adirondack Bottled Gas Corp.,* 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993).  Thus, the covenant is "an implied promise that protects against conduct which violates community standards of decency, fairness, or reasonableness."  *Harsch Props., Inc. v. Nicholas,* 2007 VT 70, 182 Vt. 196, 202, 932 A.2d 1045, 1050 (2007). "Summary judgment will be granted on a breach of the implied covenant of good faith claim where the nonmoving party cannot show

how the other undermined or destroyed its rights under the contract." *Ransome v. Metro. Life Ins. Co.,* No. 2:04-CV 15, 2005 WL 2030754, at *6 (D. Vt. Aug. 22, 2005);

A party asserting a breach of the implied covenant must demonstrate that the other party "acted beyond merely observing the terms of the loan agreement." *Southface Condo. Owners Ass'n v. Southface Condo. Ass'n,* 169 Vt. 243, 247, 733 A.2d 55, 58 (1999) ("Bad faith cannot be inferred from the expected course of business."); *see also Vescio v. The Merchants Bank,* 272 B.R. 413, (D. Vt. No. 2:99-CV-317, Oct. 10, 2001) (Sessions, J.) (holding that "actions expressly authorized under the terms of the loan agreement," including the bank's "call[ing] its notes upon default," did not constitute bad faith).

In *R&G Properties, Inc., supra,* the Vermont Supreme Court held that a mortgage lender that initiated foreclosure proceedings against a defaulting borrower, rather than amending the terms of the loan, was entitled to summary judgment on the borrower's claim for breach of the duty of good faith and fair dealing. In that case, the borrower alleged that GMAC breached its duty by refusing to agree to a substitution of collateral and by accelerating payment of

37

the loan in retaliation for the borrower's bringing suit. *Id.* ¶ 47, 2008 WL 3877126, at *12. In rejecting borrower's arguments, the Court noted that "GMAC has no obligation to amend the terms of the note merely because R&G considered amendment desirable, and GMAC was free to seek foreclosure following default." *Id.* ¶ 53, 2008 WL 3877126, at *13. The Court held that because the "lenders were fully within their rights in declining to allow partial collateral substitution," their actions "cannot be considered bad faith." *Id.,* 2008 WL 3877126, at *12. The Court found that "borrower has merely alleged bad faith while presenting no factual evidence to show that the foreclosure here was anything more than standard procedure in a case of mortgagor default." *id.,* 2008 WL 3877126, at *14. Thus, the borrower had not shown any remaining issues of material fact to be determined at trial, and summary judgment was warranted. *Id.*

Wells Fargo neither breached the covenant of good faith nor acted fraudulently by enforcing the express terms of the valid Mortgage. Section 2 of the Mortgage contemplated a 12 month payback time frame. (Doc 71-12.) Mr. Sinnott testified in his deposition that Wells Fargo never promised

the Sinnotts that they would forego the remedy of foreclosure. Given the inability of the parties to come to a mutual agreement, foreclosure was required.

Finally, the record is devoid of any evidence that the Sinnotts had other financing commitments which were lost due to the actions of Wells Fargo.

### G. Other Equitable Arguments

As part of their argument that a foreclosure would be inequitable, the Sinnotts assert that foreclosure will give Wells Fargo a "green light to continue to act in this manner" with a prediction of "catastrophic consequences for the homeowners now facing crisis in America." (Doc. 81.)

There presently is a national crisis involving homeowners who purchased their homes through high cost, sub-prime mortgage lending practices. But this case presents a different set of circumstances. This is not a case involving unsophisticated sub-prime borrowers, or hidden fees, or a failure to disclose, or usurious adjustable interest rates. Rather, it involves a conscious decision by the borrowers to not pay their property taxes for two years as part of their larger effort to get out from under the weight of a $500,000 restitution obligation arising from the

criminal conduct of one of the borrowers.  Wells Fargo
proposed an arrangement of a 12 month payback period for the
taxes paid for two prior years (as contemplated in the
mortgage instrument) and the establishment of an escrow
account for future obligations.

It also appears from the evidence that the Justice
Department, a secondary lienholder acting on behalf of the
individuals who sustained losses in the criminal conduct,
would not agree to any different arrangements. (Doc. 71-33.)
The Sinnotts claim that Wells Fargo's conduct caused them to
lose an opportunity to obtain refinancing of the Bennington
property is not supported by the evidence.  It was the
failed effort in the criminal case to persuade the Justice
Department to release the restitution lien that led to the
collapse of refinancing efforts. (Doc. 76-2, p.12.)

Finally, the matter involves the failure of the
Sinnotts to make any monthly mortgage payment after April of
2007.  Given these circumstances, Wells Fargo's conduct was
simply not the unconscionable conduct claimed by the
Sinnotts.[2]

---

[2] Wells Fargo also makes an argument in opposition to a promissory
estoppel theory Wells Fargo believes the defendants have advanced.  The
Sinnotts however state they have not raised such a claim.  (Doc. 81, p.17.)

## IV. Conclusion

There are no genuine issues involving material facts that remain to be resolved by a finder of fact. For the reasons set forth above, I recommend that Wells Fargo's motion for summary judgment be GRANTED (Doc. 75), and the Sinnotts' motion for summary judgment be DENIED (Doc. 71).

Dated at Burlington, in the District of Vermont, this 17th day of August, 2009.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. Failure to file objections within the specified time waives the right to appeal the District Court's order. See Local Rules 72. 1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).